JOHN CARTER BROWN *v.* THOMAS P. I. GODDARD *et als.*,
Trustees.

One Daniel Abbott, owning a long narrow strip of land between Shore Street, now India Street, and the then high-water mark, platted it into numbered lots each measuring 40 feet on the street and bounded by lateral parallel lines which extended indefinitely into tide-water. In 1745 and 1747 he conveyed lots numbered 3 and 4, describing each as forty feet on the street, and extending to the channel of the river; a reference to the plat was added in each deed.

Subsequently two partitions were made between the co-owners of these lots, the descriptions and lines of the lots being repeated and remaining substantially unchanged. In 1856, the owners of these and adjoining lots agreed that certain persons should plat the lots "for the purpose of running, defining, fixing, and establishing the true and exact dividing lines and boundaries of the several lots." In the preamble to the agreement the lots were described as extending "Southerly from India Street to the channel of the river." The plat thus made adopted the lateral lines of the Abbott plat, but stopped them at the then

line of tide-water. The lines of the plat of 1856 were adopted by the owners of lot No. 3, both in partition proceedings and in grants.

In 1864 a harbor line was established in front of these lots.

In equity proceedings to define the boundary between lots No. 3 and No. 4:

*Held,* that though Abbott had no title to the tide-flowed land he did have a potential right to fill out if permitted to do so by the State; that this right passed to his grantees subject to the bounding lines of his deeds, and that his grantees by accepting his deeds contracted by implication of law to observe the platted lines of the lots.

*Held,* further, that this implied contract was valid either as an estoppel or as an agreement enforcible in equity.

*Held,* further, that the owners of lots Nos. 3 and 4 had by their partition proceedings, agreements, and grants ratified and established the lateral lines of the Abbott plat.

*Held,* further, that the boundary between lots No. 3 and No. 4 was the line of the plat of 1856, prolonged without change of direction to, and terminating at, the harbor line.

BILL IN EQUITY to establish a boundary line between riparian owners and for an injunction.

*July* 3, 1880. DURFEE, C. J. The complainant and the defendants, as the defendants are trustees under the will of the late John Carter Brown, are owners of adjoining estates in the city of Providence abutting on Providence River at India Point, and lying within a harbor line established in 1864. The complainant alleges in his bill that the defendants have filled out their estate into tide-water, and in so doing have encroached on his water front. He brings this suit to have his water front defined in respect of that of the defendants and protected by injunction, and to have the defendants decreed to remove the existing encroachment on it. He claims that the dividing line of the respective water fronts ought to run, according to the rule laid down in *Aborn* v. *Smith,* 12 R. I. 370, from the point where the dividing line of the upland meets the shore, straight out to the harbor line, intersecting the harbor line at right angles; whereas the line to which the defendants have filled is the line of the upland produced, and is much less favorable to the complainant.

The rule laid down in *Aborn* v. *Smith* is the rule which has been adopted by the court for the apportionment of ordinary open shores and water fronts where the riparian owners have done nothing to vary their rights. It is applicable in the case at bar unless the parties or their predecessors in title have themselves established a different rule. The defendants claim that they have done so.

Previously to 1747 the land now belonging to the complain-

ant and the defendants was part of a larger tract which then belonged to one Daniel Abbott, who had platted it and divided that portion of it lying south of what was then Shore, now India, Street, by delineation on the plat, into numerous lots numbered 1, 2, 3, 4, 5, &c. These lots were laterally defined by lines drawn from the south side of Shore Street out over tide-water without any line to close their outer ends, thus indicating that they were intended to be indefinitely extended. There was, according to the plat, only a slender margin of upland between the south side of Shore Street and high-water mark, and consequently the lots were for the most part tide flowed or water lots. On December 23, 1747, Daniel Abbott conveyed lot No. 3, now belonging to the complainant, to one Jonathan Nichols, using the following words to describe it, to wit: " The water lot, called No. 3, is forty feet wide, fronting on a highway, and extends backwards to the channel of the river leading to Seconk. Reference to the plan of these lands will more fully appear." On June 2, 1745, Daniel Abbott conveyed lot No. 4, now belonging to the defendants, and next to lot No. 3, to one Benjamin Mann, using the following words to describe it, to wit: " A water lot, No. 4, and is forty feet in breadth, and bounds northerly upon a street or highway, and to extend southerly to the channel of the river that leads to Seconk, and is bounded easterly by a lott, No. 3, and westerly by a lott, No. 5, however otherways bounded or reputed to be bounded. Reference to the platt of those lands may more fully appear."

These two, together with several other lots, passed by mesne conveyances to Nicholas Brown, Senior, and Thomas P. Ives, copartners under the firm name of Brown & Ives, and in 1844, after their decease, were divided among their heirs and devisees, lots 3 and 4 being conveyed to Nicholas Brown, Junior, John Carter Brown, and Ann Brown Francis, devisees of said Nicholas Brown, Senior. The lots are identified in this conveyance by reference, not to the Abbott plat, but to the C. Harris plat of lands at Tockwotton, probably a copy of the Abbott plat, and are severally described as " lying on the south side of India Street, and bounding forty feet thereon, and extending to the channel." Subsequently, by partition among the devisees of Nicholas Brown,

Senior, lot No. 3, together with lots 1 and 2 next east of it, was set off to Nicholas Brown, Junior, the father of the complainant, and lot No. 4 was set off to John Carter Brown, the testator of the defendants. The C. Harris plat purports to have been made in 1804. It represents lots 3 and 4, and several other lots, as defined by parallel lines drawn from Shore Street, as on the Abbott plat, out over tide-water without any terminal line, and, like the Abbott plat, it shows only a narrow strip of upland south of Shore Street. In 1856 the lots south of Shore Street had been more or less filled or wharfed out, and, the boundary lines of some of them having become uncertain, the owners, including Nicholas Brown and John Carter Brown, agreed to appoint Samuel B. Cushing and William S. Haines to determine and plat said boundary lines, and also agreed that the lines so determined and platted should be forever deemed and taken as the true lines and boundaries. A preamble to the agreement describes the lots as lying on the south side of India Street, " and extending southerly from said India Street to the channel of the river," and the agreement itself purports to be entered into " for the purpose of running, defining, fixing, and establishing the true and exact dividing lines and boundaries of the several lots." The plat, drawn under this agreement, represents the several lots as extending southward from India Street in unequal lengths, but with their lateral lines all terminating at the water's edge. In 1868, Nicholas Brown, Junior, having deceased, his heirs at law caused partition to be made of his real estate by suit in equity. In this partition, lot No. 3 was assigned to the complainant, and lots 1 and 2 to his sister and brother. In the plat, which formed a part of the decree of partition, the lines of these lots were prolonged without change of course to the harbor line. And since the partition the complainant has mortgaged lot 3, as thus defined. The decree and plat, after they were made, were recorded in the land records of the city of Providence.

It appears in proof that John Carter Brown commenced filling in 1872. In 1873, however, the first filling sunk out of sight. In 1875 work was begun again by the defendants and carried forward to completion. The entire space between the upland lines

produced to the harbor line has been filled out. The complainant testifies that he met John Carter Brown in 1873, and told him he was encroaching, and that John Carter Brown replied that he would see to it. Six months later he died. The complainant, however, does not testify that he explained the nature of the encroachment, nor does he testify that any encroachment which he then had in mind is the same of which he now complains. He remonstrated no further, but allowed the defendants to go on without objection. He claims that he had no personal knowledge that the work was going on, and that he therefore cannot be held to have acquiesced in it.

The complainant does not complain of any encroachment by filling committed prior to 1856. He admits that the lines as then delineated by Cushing and Haines are controlling to the extent of their delineation. But he contends that, inasmuch as the lines were then delineated only to the water's edge, they are controlling only to that extent, and beyond that extent the rule laid down in *Aborn* v. *Smith* must govern. It seems to us, however, that the complainant, in coming to this conclusion, overlooks certain significant features of the agreement of 1856, as well as of the ancient conveyances and plats under which the parties to that agreement had acquired their rights. That agreement, as we have seen, stated that the lots extended to the channel, and that the purpose for which the surveyors were appointed was to determine their true boundaries. If, therefore, the lines drawn by the surveyors control only to the extent to which they were drawn, it would follow that the surveyors did not fully perform their duty, unless, which is not pretended, the lots had already been filled to the channel. But the lot-owners do not appear to have discovered any such defect in the plat, and, in our opinion, the reason why they did not discover any such defect is because *virtually* no such defect exists. The lot-owners knew that, according to the plat and conveyances under which they held, their lots extended continuously between straight lines to the channel; and that, therefore, as the lines had been established to the water's edge, it would only be necessary, as the water's edge receded by filling, for the lines to follow straight on after it. And that the plat was so understood is apparent from

the fact that though the agreement states that the lots to be de-
fined all extend to the channel, the lots as delineated on the plat
follow the irregularities of the shore, and are of very unequal
lengths. This peculiarity is the less surprising because the plat
was made before the establishment of any harbor line, and it could
not have been expected that the surveyors would undertake to
determine the line of the channel, the purpose of the lot-owners
being simply to establish the boundaries of their several lots as
between themselves. Even the complainant himself, as well as
the other lot-owners, appears to have so understood the plat and
acted upon it up to within a short time of the commencement of
this suit, thus giving it a practical construction.

We think, therefore, that there is nothing in the plat of 1856
to prevent our going back to the older plats and the title deeds.
We think, too, that the lots which those deeds, not only the
original but also the partition deeds, purport to convey are lots
extending indefinitely out into the river between parallel lines
forty feet apart, and that if we give the deeds effect according to
their terms or intent, the defendants have committed no encroach-
ment. The question then is, Can we or shall we give them effect
in that manner? The deeds purport to be absolute conveyances
of land under tide-water. Of course they were ineffectual to pass
the title to any such land, the fee being in the State. We cannot
give the deeds effect as absolute conveyances. But the grantor,
though he had no actual title, and accordingly could convey none,
yet had a sort of inchoate or potential title by virtue of his right
to fill out under leave of the State, and this, under deeds purport-
ing to convey the lots as platted, would enure to the benefit of the
grantees, agreeably to the plat by way of estoppel or agreement
enforcible in equity. The case stands in this wise: A hundred
and fifty years ago, Daniel Abbott owned the entire tract of land
at India Point. Whatever right or privilege there was to fill out
into the river appertained to him as riparian proprietor. He
platted his land, extending the lateral lines of the lots south of
Shore, or India Street, indefinitely out into the river. Now if,
before giving any deed, he had filled out his land as far as the
State would permit, and then had conveyed the lots as platted,
there can be no doubt that his grantees would be entitled to the

lots as platted, and only as platted. But he had a right, without filling out his land, to prescribe the terms on which he would part with it, and he did prescribe the terms, impliedly at least, when he conveyed the lots as platted. His grants so made were all subject to an implied contract or assurance on his part, that his grantees should have not only the upland, but also whatever right or privilege he himself had to fill it out, and incorporate with it the tide-flowed flats and river bed as platted, and were also subject to an implied contract on the part of the grantees, that in filling out they would keep within the lines of the lots as platted. These implied contracts have been repeatedly renewed and reaffirmed by the subsequent deeds of grant and partition, and by the acts and conduct of the grantees under them, so that they now present the strongest possible claim upon the court to prevent their repudiation and enforce them. In this respect the case at bar is fully, and much more than fully, within the rule laid down in *Stockham* v. *Browning*, 18 N. J. Eq. 390, 396. " Persons," say the court in that case, " who have for years recognized and acquiesced in a line as separating their inchoate and imperfect rights upon the shore, should be held bound by such acknowledgment and acquiescence for the same reason that they are held to be bound by them as to lines on upland. And see *O'Donnell* v. *Kelsey*, 4 Sandf. 202, affirmed in 10 N. Y. 412. We have here not only the lines recognized and acquiesced in, but deeds of grant and partition in accordance with them, and on the understanding that they should be observed.

*The bill is dismissed.*

*Edward C. Ames & Samuel Ames*, for complainant.
*Tillinghast & Ely*, for respondents.